JOHN F. ADAMS *vs.* PROBATE COURT OF CENTRAL FALLS *et al.*

PROVIDENCE—JUNE 20, 1904.

PRESENT: Tillinghast, Douglas, and Blodgett, JJ.

(1)  *Equity.   Mistakes of Law and Fact.   Bonds of Executors.*

A bill in equity brought by A., executor and residuary legatee of the will of B., alleged that he was given two blank forms of bonds, and, being ignorant as to the distinction between them, sought advice of the deputy probate clerk, and was advised to give a bond to pay debts and legacies, which he did, ignorant of the effect of such bond; that by an inventory which he caused to be made there appeared to be assets in excess of the amount required to pay debts and legacies, but that after more than one year from giving said bond he discovered that the assets were insufficient to pay legacies. The bill asked that prosecutions of suits and all proceedings to enforce the bond be enjoined and that complainant be permitted to substitute therefor *nunc pro tunc* an executor's bond in the usual form to return an inventory and account. On demurrer:—

*Held,* that, under the provisions of the statutes, free choice was given the executor as to which form of bond he would give, to each of which the law annexed certain obligations, which were not elements of an agreement between the parties, but provisions of general law.

*Held,* further, that the bill set forth no mistake of law or fact entitling complainant to relief.

*Held,* further, that the mistake, if any, was of complainant alone, and as the legatees, through no fault of their own, could not be put in *statu quo,* complainant was not entitled to relief.

BILL IN EQUITY on grounds set forth in opinion.   Heard on demurrer to bill, and demurrer sustained.

DOUGLAS, J.   Stephen L. Adams, of Central Falls, died

August 11, 1900, leaving a will which was admitted to probate
September 12, 1900, in which his brother, the complainant,
was appointed executor and made residuary legatee. The
respondents, besides the Probate Court and the United States
Fidelity and Guaranty Company, are legatees under the said
will.

The complainant, on September 12, 1900, accepted the
appointment as executor and gave bond to the Probate Court,
with the United States Fidelity and Guaranty Company as
surety in the penal sum of one hundred thousand dollars, the
condition whereof is as follows: "The Condition of this Obli-
gation is Such, That whereas, the above bounden John F.
Adams has this day taken upon himself the office of Executor
of the last Will and Testament of Stephen L. Adams, late of
the City of Central Falls, deceased, and thereby the burden of
paying the funeral charges and the debts of the deceased
and the legacies granted by said Will; Now therefore, if the
said John F. Adams heirs, executors or administrators, or
any of them do well and truly pay, or cause to be paid, the
debts and legacies aforesaid, and in all matters the same con-
cerning, faithfully fulfill the said Will, and administer thereon
according thereto, and render upon oath an account of his
proceedings thereupon, when thereunto lawfully required;
then the before written Obligation to be void and of none effect,
or else to be and remain in full force and virtue."

Suit has been brought upon this bond for the benefit of the
legatees and is now pending in the Common Pleas Division of
this court, and this bill asks that the further prosecution of
said suit and all proceedings for the enforcement of the bond
may be enjoined, that said bond be cancelled and the com-
plainant be permitted to substitute therefor *nunc pro tunc* an
executor's bond in the usual form to return an inventory and
account of the estate of the testator.

The statements upon which the complainant bases this
prayer are contained in the second, third, fourth, and tenth
paragraphs of the bill, as follows:

"*Second.* The complainant was named as executor of
said will, and immediately upon the probating thereof, took

steps to procure a bond and to qualify as executor by the filing of such bond with the Probate Court. He was given two blank forms of bonds and was informed that he could file either when properly filled out and executed. The one was an executor's bond to return an inventory; the other was a bond to pay the debts and legacies of the deceased. The complainant was at that time wholly ignorant as to the distinction between these two forms of bonds. He therefore sought advice in regard to the matter of James B. Gooding, who was at the time acting as deputy clerk in the office of the probate clerk of the City of Central Falls. The complainant was informed by Mr. Gooding that upon the payment of a fee of one hundred (100) dollars to the Probate Court, he could give a bond to pay debts and legacies and thereby avoid the necessity of returning an inventory, and Mr. Gooding advised the giving of such bond. The complainant thereupon gave a bond to pay debts and legacies, a copy whereof is hereto annexed, marked 'Exhibit B,' with the respondent, the United States Fidelity and Guaranty Company, as surety thereon. The complainant understood that the payment of one hundred (100) dollars to the Probate Court was the consideration for being exempted from returning an inventory to the court, and he was not then, nor for a long time afterwards, aware that by giving such a bond he was in any way personally liable to make up the deficit, if any, in the assets, so as to enable the estate to pay the debts and legacies in full. If he had been aware that such was the effect of giving a bond to pay debts and legacies, he would never have given a bond in that form.

"*Third.* The question of a personal liability upon said bond was not called to the attention of the complainant at the outset, owing to the fact that he caused to be made for his own use, by three disinterested persons, an inventory of said estate, and by that inventory, which was taken at a fair valuation of the property, there appeared to be assets in excess of the amount required to pay the debts and legacies of the deceased. Since that time, however, one item thereon, viz., three hundred seventy-nine (379) shares of the capital stock of the Stafford Manufacturing Company, has become worthless;

this company has been forced to make an assignment, and its assets will not suffice to pay its indebtedness, thus leaving no equity therein for stockholders. This company was a close corporation, the stock of which was not for sale in the open market; it was impossible to dispose of said stock after the qualification of the complainant as executor of said estate, and the depreciation. in the value of said stock was wholly due to conditions beyond his control.

"*Fourth.* The debts which said Stephen L. Adams owed at the time of his decease were largely in excess of what the complainant, at the time when he gave said bond, had supposed they were; a large amount of securities, which the complainant believed to be available to pay debts and legacies, were, after said bond was given, found to be hypothecated for loans, leaving a smaller equity therein for the benefit of the estate than the complainant had supposed.

"*Tenth.* The complainant, in giving said bond, was clearly acting under a misapprehension as to the law and as to the liabilities he was assuming thereby; and had good reason to believe at that time that the assets of said estate were sufficient to meet all debts and legacies; but that, in the event of this not being the fact, he believed that he incurred only a liability to administer the estate faithfully and to divide the assets remaining after the payment of the debts proportionately among the legatees, according to law. The complainant did not become aware, until about one year after the giving of said bond, that there would probably be an insufficiency of assets to pay the legacies, and at or about the same time, James E. Smith, as that time the special agent of the respondent, the United States Fidelity and Guaranty Company, informed the complainant that, in such event, there might be a personal liability upon the complainant to pay these legacies in full, by reason of the form of bond given by him as executor to the Probate Court of the city of Central Falls. Immediately thereupon, the complainant consulted with Messrs. Edwards & Angell, attorneys-at-law, and was advised by them, in a letter dated September 20th, 1901, that if the assets were insufficient to pay the legacies, there existed a liability

against the complainant as principal and the United States Fidelity and Guaranty Company as surety, upon said bond. . . . The complainant further says that if he had realized that by giving such bond he was incurring an obligation to pay the debts and legacies whether or not the assets of the estate were sufficient for that purpose, he would never have given such bond, but would have given the ordinary executor's bond to return an inventory."

Three of the respondents have joined in a demurrer on these grounds:

(1) The surety company, having interests identical with those of the complainant, should not have been joined as respondent without allegation that it had refused to join as complainant.

(2) It is immaterial that complainant sought and acted upon the advice of Gooding without alleging that Gooding imposed on or deceived the complainant, and that Gooding was acting in behalf of the respondents when he made the statement alleged.

(3) The mistake of law alleged is not a ground for equitable relief.

(4) This was not a mutual mistake of law, of complainant and respondents.

(5) The mistake of law was not caused by any act or omission on the part of the respondents.

(6) The mistake of fact was not mutual.

(7, 8) The complainant was guilty of negligence in making the alleged mistakes of fact in regard to the condition of the estate, and in not knowing the effect of the bond.

(9, 10) The complainant was guilty of laches in acting as he did after he found out his mistakes of law and fact.

(11) The fact that complainant acted on the advice of counsel after discovering his mistake is immaterial.

(12) That before bringing this bill the complainant has not submitted to judgment in the action at law.

The first and last four grounds of demurrer do not go to the merits of the case; but, upon the other points, the question

arises whether upon the facts stated in the bill the complainant is entitled in equity to relief from his obligation.

(1)    In discussing this question it is first of all important to consider the character of the obligation involved and the relations of the parties concerned. Our statutes recognize two relations which an executor may assume towards the estate of the testator, which are pertinent to this inquiry.

An ordinary executor is required to give bond with sureties, to perform his duties as such, and these duties are generally to return an inventory, to collect the assets and reduce them to money, to pay the debts and to distribute the surplus to the legatees, and to make certain returns to the court.

An executor who is also residuary legatee may give bond to pay the funeral charges, debts, and legacies, and, having done this, he may take possession of the assets as his own property and dispose of them as he sees fit to his own use. He may pay the debts and legacies either out of the assets or out of his own estate. Neither the court nor the legatees are concerned with his management of the estate or with its fortunes, or can call him to account therefor after it passes into his hands. If losses occur, the executor must bear them. If the property increases in value, the profit is his. To all intents and purposes the bond stands in place of the estate.

These obligations are not elements of an agreement between parties, but are provisions of general law. In reducing to writing a private agreement, mistakes may be made which the courts will correct, but no such mistake can be made in construing the provisions of an executor's bond. If the bond is imperfect in form, the obligations imposed by law are not impaired by that circumstance. Gen. Laws cap. 220, § 3, provides: "Every executor . . . who has given to the probate court an instrument purporting to be a bond which has been accepted as such by the probate court having jurisdiction to accept it, shall be qualified as executor, . . . notwithstanding any defect in such instrument and notwithstanding any error committed in giving or accepting the same; but nothing herein contained shall affect the right of appeal in such cases. Such instrument, if no such appeal be taken

or sustained, shall thereafter be considered for all purposes a bond and its deficiencies otherwise supplied according to the facts," etc.

The consequences of executing one or the other kind of bond are not only specified by general law, but it is also provided by statute that the executor who is residuary legatee may choose which bond he will give.   It is provided by Gen. Laws cap. 220, § 7:  "If the executor be residuary legatee, he may give bond only to pay the funeral charges, debts, and legacies of the testator, and need not render an account to the probate court."

The nominal parties to this proceeding are the Probate Court and the executor, but the real parties in interest are the creditors of the estate and the legatees under the will on the one hand, and the executor and his surety on the other.   If the executor chooses to give the ordinary bond, the creditors and the legatees have the right to demand an inventory of the estate and to be heard upon propositions to dispose of the assets and matters of management and administration generally.   If the executor chooses to give the bond to pay funeral charges, debts, and legacies, none of the parties interested have anything to do with the executor except to enforce the obligations covered by his bond.   The real parties interested in the choice which the executor should make on the 12th day of September, 1900, were the creditors and legatees and the executor, and neither the Probate Court, nor the creditors, nor the legatees had any right to dictate or control his choice. Their only right in the matter was to see that the amount of the bond and the surety were satisfactory.

Such a contract or undertaking is manifestly different from an agreement between contracting parties where there must be a meeting of two minds and where one contract may be contemplated and a different one expressed.   In this case, also, there is no place for fraud or misrepresentation.   So far as appears the parties in interest never saw each other, at any rate never conferred together, before the complainant made his choice.   The law gave the complainant a choice between two alternatives, to each of which the law annexed certain

obligations. He chose one, without interference of the legatees, upon such information and for such reasons as he saw fit.

With this preliminary understanding of the situation and relations of the parties, we are prepared to estimate the reasons advanced by the complainant for now asking that he may reverse the choice which he made on that day.

He substantially relies upon two grounds—an alleged mistake of law and an alleged mistake of fact. The rest of the stating part of the bill is inserted to show that by his subsequent conduct with regard to the estate he has not lost any right which he may have to plead the mistakes he made at the "outset."

It is not clear that the complainant was led to make the choice he did from any mistake or ignorance of the law. He tells us, on the contrary, that he gave no thought at all to the question of personal liability, because he supposed the assets of the estate to be ample to meet any liabilities which he might be assuming. His statement that if he had known that the bond in question imposed upon him a personal liability he would not have signed it is a conjecture which we think may be incorrect. If he had known the full purport of the bond it seems to us quite probable that he would have signed it with no fear that the liability would ever become fixed. The information which was given him was all which he cared to acquire. He was told that he could take possession of the estate without rendering any inventory on paying a certain court fee and giving one of the bonds which were presented to him. He thought the estate was sufficient to satisfy all the claims which the executor would be called upon to meet; and so, without making further inquiry as to the law, he made his choice.

The mistake of fact seems to have been the only one which in any way influenced his choice. This mistake was in overestimating the net value of the estate beyond the debts and liabilities, and this estimate was made with full opportunity of examination. He says that "he caused to be made for his own use, by three disinterested persons, an inventory of said estate." Thus, if we concede that he was ignorant of the law and mistook the fact, in each case he obtained the opinion of

persons of his own choosing, and then deliberately made his choice.

We have carefully examined all the cases cited by complainant's counsel, and find in them no analogous conjuncture of circumstances where equity has interfered to annul an obligation. His argument is a misapplication or distortion of well-settled equitable principles. It is a mosaic of gems which do not fit the pattern.

He cites *Huguenin* v. *Baseley*, 14 Ves. 273; *Phillipson* v. *Kerry*, 32 Beav. 628; *Nanney* v. *Williamson*, 22 Beav. 452, and *Russell's Appeal*, 75 Pa. St. 269, cases of voluntary conveyances; but as a consideration for this bond the complainant received the whole of his brother's estate as his own property, to do with it as he thought best.

He cites *Fehlberg* v. *Cosine*, 16 R. I. 162; *Camedy* v. *Marcy*, 13 Gray, 373; *Freichnecht* v. *Meyer*, 39 N. J. Eq. 551; *Champlin* v. *Laytin*, 6 Paige, 189, to the proposition that a mutual mistake of law may be ground for reforming a contract; but the parties interested in the enforcement of this bond had no part in the making of it.

He cites cases of purchasers of property which did not actually exist at the time of the contract, and where the consideration wholly failed, which are obviously distinguishable from the case at bar.

He cites cases where unconscionable bargains have been set aside because one of the parties has suppressed information which it was his duty to impart to the other, as in *Pickering* v. *Pickering*, 2 Beav. 31, where a man was dealing with his mother, and *Haviland* v. *Willets*, 141 N. Y. 35, where an executor was dealing with the heir at law, and he bases this branch of his argument upon the assumption that the acting deputy clerk of the Probate Court represented the legatees.

Such an assumption is entirely unwarranted by the fact, and, furthermore, it appears that the clerk's information was correct as far as it went. It probably did not occur to the clerk that the title printed on the bond and the release from making an inventory would not be sufficient notice, to a man of ordinary intelligence, of the substitution of his personal

liability for the responsibility of the estate itself.  If the clerk turned aside from the routine of his official duties to answer the complainant's questions, it was a gratuitous service, and if he gave advice unasked it was an impertinence, and the legatees were responsible for neither.  It might well be considered the duty of the court to instruct illiterate or ignorant persons having to transact probate business without the aid of counsel, as is suggested in *Morgan* v. *Dodge*, 44 N. H. 255, but the complainant does not allege any deficiency of mind or of business experience which should have moved the Probate Court of Central Falls to assume such responsibility in his case.

The complainant's counsel quotes from Kindersley, V. C., in *Small* v. *Currie*, 2 Dr. 102:  "If, indeed, the person taking the indemnity does, either by the frame of the instrument . . . or in any other manner, mislead the surety as to the effect of it, . . . or takes advantage of his ignorance or distress . . . or if he knows or has reason to believe that the surety misapprehends the nature or effect of the instrument, and allows him to execute it without removing such misapprehension by sufficient explanation, in any such cases no doubt a Court of Equity would interfere to prevent any advantage being taken of a bond of indemnity so procured. And so it would in the case of any other species of instrument so procured," but he omits to quote the next sentences of the learned Vice-Chancellor's opinion, which continues as follows: "But if none of these circumstances occur, if the party to whom the indemnity is to be given, having prepared or caused to be prepared the instrument which he requires in clear and intelligible terms, transmits the draft to the intended surety for his approval, so that he has the full opportunity not only of duly considering it himself uninfluenced by the representations or even by the presence of the other, but of procuring the advice and assistance of his own solicitor, I know not by what rule or principle of justice or equity his omission to enter into a particular explanation of the terms or tenor or effect of the proposed instrument is to have the effect of rendering it void."  If these observations were just in the case of an instrument between private parties, how much more conclu-

sive are they against the contention of the complainant when the instrument he has executed is one dictated by statute and in the form which has been in common use for many years.

.Again, where the mistake is of one party alone, and the other party has been guilty of no fraud, misrepresentation, or concealment, equity can only interpose to cancel the contract, and will not do so unless it can be done without loss or injustice to the other party. *Fehlberg* v. *Cosine,* 16 R. I. 162.

The complainant here offers to substitute one broken bond for another. He has not settled the estate, and can not do so now within the period fixed by law. Nor can he restore it now as it was three and a half years ago. He took it away from the interference and supervision of the court and of the legatees by his arbitrary choice, and now wishes to return it impaired and diminished in value. It does not lie in his mouth to say that the same deterioration would have occurred if some one else had managed it, or that the losses have not come by his fault. He alleges that he could not sell the Stafford Manufacturing Company stock, but he does not allege that he made the attempt. He could at least have offered to divide the stock amongst the legatees, but he preferred to retain it for himself.

From whatever cause, certainly from no fault of the legatees, they can not be put *in statu quo,* and hence the complainant's prayer cannot be granted.

These considerations being in our opinion decisive of the case, we need not examine the other grounds of the demurrer nor attempt to enumerate the rare exceptions to the rule that a mistake of law will not furnish ground for equitable relief.

The demurrer must be sustained and the bill dismissed.

*Edwards & Angell,* for complainant.

*Nathan W. Littlefield, Chester W. Barrows, Lellan J. Tuck, John N. Butman and James E. Smith,* for respondents.